ROBERT M. PARKER, Circuit Judge:
Plaintiff-Appellant Steven M. Klumpe brought a wrongful discharge suit against his former employer IBP, Inc., claiming that he was terminated solely for his refusal to commit an illegal act. A jury agreed and awarded compensatory and punitive damages. The district court subsequently entered a take-nothing judgment, however, concluding there was no evidence that Klumpe’s conduct would have been illegal. We affirm.
BACKGROUND
This matter arises from an on-the-job accident at IBP’s Amarillo, Texas slaughterhouse. Chris Escamilla, an employee there, operated a hock cutter at the plant.[2] On April 5, 1997, the cutter severed three- and-a-half fingers from his right hand. Escamilla is Klumpe’s step son,[3] and Klumpe also worked at IBP’s Amarillo plant. At the time of the accident, Klumpe had been working at IBP for about 15 years — ever since he had graduated from high school — and was in the position of superintendent trainee. Klumpe attended to Escamilla following the accident but was not his supervisor.
IBP does not participate in Texas’s statutory workers’ compensation scheme, but instead has its own plan — the “Workplace Injury Settlement Program-Texas” (“WISP”). IBP conducts an orientation for new employees regarding the benefits of WISP. During the orientation, an IBP supervisor reads to employees from a prepared script. Employees are also given a written summary of the plan, called the “summary plan description” or “SPD.” The script states that the SPD contains “just about everything you need to know about your Program, including your rights and responsibilities.” To receive benefits under WISP, workers must sign an “Acceptance and Waiver.” According to the script, the waiver “is an agreement between you and IBP that your claim will be settled by your participation in the Pro *281 gram and that you will not sue IBP in civil Court.”
Shortly after the accident, Klumpe was several times asked to secure a waiver from Escamilla. Each time he refused. On April 15, 1997, Escamilla sued IBP in state court. Sometime later IBP’s lawyer Ken Muncy received a subpoena ordering Klumpe to appear Monday, June 30, 1997, for deposition testimony related to Escam-illa’s suit. The subpoena also ordered Klumpe to produce “any and all documents which show the crewing guidelines for the hock cutter at the time of the incident in question.”[4] Klumpe brought the subpoena to the attention of his supervisor, Kurt Suther, who told Klumpe not to turnover the documents but said that he would speak with Muncy about the matter. On the Friday before the deposition, Suther and Klumpe met with Muncy via teleconference. Muncy told Klumpe to “bring whatever documents he had in his possession that he thought were responsive to” the subpoena. No further instructions were given regarding the documents. On Sunday, Klumpe gave his own attorney, Jeff Blackburn, the crewing guidelines for the entire plant, which included specifications for about 170 jobs. Blackburn copied Escamilla’s attorney and Muncy with the documents the same day. Klumpe was fired the following Monday, allegedly for removing confidential documents from the plant. No other reason was given for Klumpe’s termination. About a year later Escamilla’s suit was settled for $1.9 million.
Klumpe brought a wrongful discharge action against IBP, claiming that the sole reason for his termination was his refusal to secure Escamilla’s waiver. Klumpe argues that to seek Escamilla’s waiver would have been an illegal act because the SPD and orientation script misrepresent the benefits provided under WISP. The jury agreed and awarded Klumpe $802,000 in compensatory damages and $10 million in punitive damages. The district court subsequently invited IBP to file a motion for judgment as a matter of law, which it did, and after briefing, the court rendered a take-nothing judgment. Klumpe made a timely appeal.
DISCUSSION
In diversity cases,[5] we apply state substantive law together with the federal rules of procedure. See Ellis v. Weasler Eng’g, Inc., 258 F.3d 326, amended on other grounds by 274 F.3d 881 (5th Cir.2001). The district court’s entry of judg ment as a matter of law is review de novo. See Flowers v. S. Reg’l Physician Servs., 247 F.3d 229, 235 (5th Cir.2001). “If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law....” Fed.R.Civ.P. 50(a)(1). In evaluating the sufficiency of the evidence, we must draw all reasonable inferences and resolve all credibility issues in favor of the nonmoving party. See Flowers, 247 F.3d at 235. When the jury has found for the nonmov-ant on the disputed issue, we will not overturn the verdict “unless the facts and inferences point ‘so strongly and overwhelmingly in the movant’s favor that rea *282 sonable jurors could not reach a contrary conclusion.’ ” Id. (quoting Omiteck Int'l v. Clorox Co., 11 F.3d 1316, 1322 (5th Cir.1994)).
Texas adheres to the rule of at-will employment, under which employment for an indefinite term may be terminated at will and without cause. See Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 489 (Tex.1991). An exception to this rule is the doctrine announced in Sabine Pilot Service, Inc. v. Hauck, 687 S.W.2d 733 (Tex.1985), where the Texas supreme court gave an at-will employee the right to sue for wrongful discharge when he was fired solely for refusing to commit an unlawful act carrying criminal penalties, id. at 735. In a Sabine Pilot claim, whether the employee’s conduct would have constituted an illegal act requires an examination of the provision that allegedly prohibits the conduct. The trial court must determine as a matter of law whether the provision makes its violation a criminal offense. See id. at 736 (Kilgarlin, J., concurring). After that, the jury decides whether the employee’s conduct would have been “an illegal act.” Texas PatteRn JuRY Charges-.Business, Consumer & Employment PJC 107.3 (2000 ed.). To make this finding, the jury is instructed on what constitutes an offense of the provision at issue. See id. The plaintiff-employee is responsible for convincing the jury that he was fired solely for refusing to commit the illegal act and must do so by a preponderance of the evidence. See Sabine Pilot, 687 S.W.2d at 735.
Section 32.46 of the Texas Penal Code is the only provision upon which Klumpe relies in making his Sabine Pilot claim.[6] It prohibits using deception to secure the execution of a document. See Tex. Penal Code Ann. § 32.46 (Supp.2002). The district court’s charge to the jury, which is not challenged on appeal, mirrors § 32.46. It says: “A person commits an illegal act if, with intent to defraud or harm any person ... he, by deception, causes another to sign or execute any document affecting the pecuniary interest of any person. Committing such an act subjects the violator to criminal penalties.”
In its order granting IBP judgment as a matter of law, the district court determined that there was no evidence of deception or that the deception (if any) would have caused Escamilla to sign the waiver. Specifically, the district court said:
[T]he failure to elaborate on mentioned programs or the inconsistencies in contractual documents in question do not by themselves constitute deception that would support a criminal prosecution under Texas Penal Code Section 32.46 against Klumpe if he obtained the waiver. The record in this case is devoid of evidence that those omissions or discrepancies were likely to affect the judgment of Escamilla in the case before this Court. Essential elements of a violation of Section 32.46 are missing.
IBP also argues that there is no evidence that the sole reason Klumpe was fired was his refusal to get Escamilla’s release.
*283 I.
The jury could rightly conclude that Klumpe was fired for not getting Escamil-la’s release. First, the record suggests that the stated reason for Klumpe’s termination was pretext. Klumpe discussed with his supervisor the subpoena in the Escamilla suit. Having apparently resolved Suther’s objection to releasing the subpoenaed documents, Klumpe forwarded them to his attorney. IBP argues that toning over the crewing guidelines for the entire plant far exceeded the scope of the subpoena, which requested only the guidelines related to the hock cutter. But IBP’s attorney never told Klumpe which documents to bring to the deposition, instead letting Klumpe decide for himself what was responsive to the subpoena. IBP also argues that Klumpe should have waited until Monday to hand over the documents. IBP knew, however, that Klumpe had hired an attorney to represent him in the Escamilla suit. In a letter Blackburn had advised IBP that IBP personnel should refrain from discussing the Escamilla suit with Klumpe unless he was present. Thus, IBP should have known that Klumpe would make available to his own attorney the subpoenaed documents and that he would do so before he was scheduled to be deposed on Monday. Nor should IBP have been surprised to learn that Blackburn sent copies of the subpoenaed documents to the other attorneys in the case, as he was required to do under the Texas Rules of Civil Procedure.
Second, the jury could conclude that IBP attempted to pressure Klumpe into getting Escamilla’s waiver. Klumpe testified that immediately after the accident he was met at the hospital by IBP employee Terry Zimmerman. Zimmerman told him that unless the release was signed Escam-illa’s medical bills would go unpaid. There was also evidence that Zimmerman had been confrontational in extracting a waiver from another injured IBP employee. A week after the accident, Klumpe met with Suther to see what the company intended to do for Escamilla. Klumpe testified that Suther threatened to fire him unless he got Escamilla to sign the waiver.[7] Although Suther denied making any threats, the jury could have simply chosen to believe Klumpe instead.
Third, the jury could find that IBP was motivated to get Escamilla’s waiver by any means necessary. The evidence showed that an injury virtually identical to Escam-illa’s had occurred several years before. Andres Estrada, like Escamilla, lost three fingers while operating a hock cutter. Following the Estrada incident, IBP automated the cutters, but later concluded that they did not work as well as the manual ones and switched back. Unlike Escamil-la, Estrada elected to receive benefits under WISP, thus waiving his right to sue. Estrada received a total of $77,000— $65,000 for medical expenses, and $12,000 in lost wages. Knowing that the hand-held hock cutters had an established history of causing severe injury, IBP had an incentive to secure Escamilla’s waiver before he had a chance to sue. The amount of Escamilla’s settlement, as compared to what Estrada got, is evidence of the exposure IBP was facing. And so, too, is the fact that the company sought out Klumpe to get the waiver, rather than Escamilla’s own supervisor or someone besides a close relative.
*284 In sum, the record would allow the jury to conclude that Klumpe was not in fact fired for disclosing confidential IBP documents, and that IBP had a compelling motive to get Escamilla’s waiver and aggressively sought it. Besides the incident with the crewing guidelines, there was no material evidence of any misconduct during Klumpe’s 15 years’ at IBP, and as stated, no other reason was given for his termination. Viewing these facts together, the jury could infer that Klumpe was fired solely for not getting the waiver.
II.
Although the jury could find that IBP fired Klumpe solely for refusing to get Escamilla’s waiver, there is insufficient evidence that Klumpe would have committed an illegal act had he instead agreed to try. Section 32.46 requires deception. In its charge, the district court defined “deception” to include:
1.) Creating or confirming by words or conduct a false impression of fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;
2.) Failing to correct a false impression of fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true; [or] ...
4.) Promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed....
Thus, to be convicted under § 32.46 the defendant must have at least created a false impression or made an illusory promise. Klumpe argues that there are at least three areas in which the SPD and orientation script make deceptive representations.[8] If we conclude that there is no evidence that either document in fact makes such misrepresentations, a prosecution under § 32,46 could not be sustained. And unless there is proof that seeking Escamilla’s release would have been unlawful under § 32.46, IBP’s firing Klumpe for refusing to try does not give rise to a Sabine Pilot claim. We will examine the SPD and orientation script in some detail.
The first alleged deception concerns the provision of lifetime benefits for injured workers. Klumpe contends that the SPD promises such benefits, but that WISP in fact provides them only under strictly limited circumstances, and even then only for a maximum of 401 weeks. The SPD describes the “kinds of payments” the plan provides, beginning with short-term benefits. The first kind is “Temporary Disability Payments,” which are provided until the worker reaches maximum medical improvement. Second is “Impairment Payments,” which are provided in cases where *285 the worker has been permanently disabled. The specific amount paid for impairment depends on “the percent of impairment to the body as a whole.” Third, the SPD promises “Supplemental Payments,” which make up for the difference between the worker’s pre-injury and post-injury income. The SPD does not specify the length of time for which IBP is responsible for payments of the first three kinds. The existence of the last category of payments, entitled “Lifetime Payments,” however, indicates that the other payments do not continue for the life of the injured employee. According to the SPD, to receive lifetime payments the injured employee must be “unable to return to any work whatsoever”-a prerequisite that suggests a severe disability. Six disability categories qualify for lifetime payments.[9] For these, there is no dispute that IBP is bound to provide lifetime benefits. It is for the other types of payments that the maximum outlay is 401 weeks. We conclude that the SPD is not deceptive in describing the lifetime benefits.
The second alleged misrepresentation regards WISP’s arbitration provision. The orientation script states that IBP is “bound to honor” the decision of a “neutral arbitrator” regarding an injured employee’s coverage under the plan. The SPD makes similar representations. It is undisputed that neither the SPD nor the orientation script nor the plan itself expressly permit appeal from the arbitrator’s decision. Klumpe argues that IBP does not consider itself bound by an arbitrator’s decision, and he points to a recent example in support of his contention. The jury heard evidence that former IBP employee Michael Glover agreed to proceed under WISP, but was dissatisfied with IBP’s treatment of his claim for benefits. He sought to have his claim reviewed by •& neutral arbitrator in accordance with WISP’s provisions. The arbitrator found for Glover, but IBP refused to honor the arbitrator’s decision, claiming that the arbitrator had exceeded his powers.[10]
The Federal Arbitration Act (“FAA”) governs actions to enforce an arbitration clause in cases in which the district court has original jurisdiction. See Bank One, N.A. v. Shumake, 281 F.3d 507, 513 (5th Cir.2002). Under the Act, an arbitration agreement is enforceable unless “such grounds exist ... for revocation of the contract.” 9 U.S.C. § 2. One such ground is where the arbitrator has exceeded his powers. See id. § 10(a)(4). In that case, the aggrieved party may petition the district court to vacate the award. See id. By contracting for arbitration, “It is presumed that the parties intended to relinquish their right to appeal the merits of the dispute, not their right to appeal an arbitration award that resulted from the arbitrator’s abuse of authority or bias.” *286 Team Scandia, Inc. v. Greco, 6 F.Supp.2d 795, 798 (S.D.Ind.1998). The parties cannot opt out of the FAA unless they clearly state their intent to do so. See Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 294-95 (3d Cir.2001)(Becker, C.J.)(Construing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)). In this case, we see no evidence that the parties sought to require arbitration under provisions different than those in the FAA. We therefore conclude that IBP’s appeal in Glover’s case does not make the SPD or orientation script deceptive.
Finally, we turn to Klumpe’s allegation regarding IBP’s “Restricted Duty Program.” According to the orientation script, an injured worker “will be assigned to the restricted duty program in accordance with the restrictions assigned by your doctor.” The script says nothing further about this program, and the SPD says nothing about it at all. Restricted duty is available until the injured employee reaches “maximum medical improvement.” Thereafter, the employee has thirty days to find and bid on a job at IBP that is concomitant with his disability. If he cannot find such a position, the employee is put on unpaid leave. While on leave, he may bid on any position for which he is qualified that becomes available. If he cannot find a suitable position within one year of being put on leave, the employee will be terminated.
At trial, Klumpe introduced evidence showing that the restricted duty program can have a severe effect on an injured employee. Andres Estrada testified that union rules did not permit him to bid for a position unless he had seniority over other qualified employees. Not surprisingly, light-duty work was the most sought after at IBP. To qualify for a more strenuous position, Estrada had to lie about his disability. Working at IBP was difficult without the use of both hands. Later, Estrada was returned to the hock cutter, but found it difficult (mentally and physically) to use the same machine that cut off his fingers. Never having found another satisfactory position at IBP, he eventually had to quit.
We agree with the district court that the SPD and orientation script were not deceptive for failing to include more information about the restricted duty program. The restricted duty program is not part of WISP. It was the product of an agreement between IBP and the worker’s union. Whether or not an injured employee elects to receive benefits under WISP, he must find a compatible position within, thirty days of reaching maximum medical improvement. Failure to find a position will not affect the employee’s eligibility for disability payments unless he refuses to accept suitable employment. WISP is intended to be an alternative approach for compensating workers for on-the-job injuries; the restricted duty program, on the other hand, is a means for reintegrating them into IBP’s workforce. Neither directly depends on how or whether an employee proceeds under the other.
The foregoing notwithstanding, Klumpe claims that IBP management themselves admitted that the SPD and orientation script are deceptive and that employees have in fact been misled. Based on our own careful review of their testimony, we cannot agree. Suther, for example, merely admitted that none of the WISP documents discuss the restricted duty program — a fact that does not make them deceptive. He also conceded that the WISP documents do not expressly permit appeal from an arbitrator’s decision. As we have already shown, however, even a binding arbitration can be challenged on certain narrow grounds, at least unless otherwise stated. Nor did Missy Britt, an *287 IBP nurse, or Barbara Lingenfelter, IBP’s safety manager, admit to knowing of or making any misrepresentations or that their supervisors at IBP encouraged them to do so. At most Britt’s testimony shows that she never elaborated on WISP’s lifetime payment provision or on the restricted duty program, that not being her job. Lingenfelter stated that she did not advise employees that they might receive more if they sue rather than accept benefits under WISP. But the record does not show that she made a contrary suggestion, or that she ever discouraged employees from speaking with an attorney about suing IBP instead.[11]
CONCLUSION
The judgment of the district court is AFFIRMED.[12]

. Hock cutters (or "dedaw cutters") are "hydraulic scissors” used to sever the hoofs from a cow.

.Escamilla is Klumpe's legally adopted son, but since both parties refer to Escamilla as Klumpe’s step son, we will too.

. Crewing guidelines describe how IBP's operations are staffed. At trial, counsel for IBP stated that “hundreds of thousands of dollars” are spent developing the guidelines, and for that reason IBP does not disclose them.

. IBP is a South Dakota corporation with its principal place of business there.

. As an aside, we note that Texas law makes it illegal to fire or discriminate against an employee who has filed a workers' compensation claim. See Tex. Labor Code Ann. § 451.001 (1996). The same law does not apply to non-subscribing employers, however. See Tex. Mex. Ry. Co. v. Bouchet, 963 S.W.2d 52, 55-56 (Tex.1998). Further, there is no common-law exception to the rule of at-will employment which protects the employees of non-subscribing employers against similar retaliation. See Watkins v. Diversitech Corp., 988 S.W.2d 440, 441 (Tex.App.-Houston [1st Disl.] 1999, pet. denied). Hence, co-workers like Klumpe are not protected against retaliation either.

. Q: [D]id Mr. Suther ever specifically talk to you about the waiver?
A: Yes.
Q: What did he tell you?
A: He told me that I will get that waiver signed or I will — I will fire your F— ing ass....

. Even if the SPD and orientation script in fact are deceptive, IBP argues that Klumpe did no act to create the deception. If IBP is correct, however, Klumpe could still have been held responsible for violating § 32.46 as an accomplice. See Tex. Penal Code Ann § 7.02(a)(2)(1994)("A person is criminally responsible for an offense committed by the conduct of another if ... acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense....”). At the same time, we note that the juiy in this case was never instructed on accomplice liability. Under Texas law, the jury is not free find the defendant guilty as an accomplice unless the court's instructions authorize it to do so and include the essential elements of proof for making such a finding. See Plata v. State, 926 S.W.2d 300, 304 (Tex.Crim.App.1996). Thus, to sustain his Sabine Pilot claim Klumpe had to prove that his conduct alone would have constituted an offense under § 32.46.

. Section 3.16 of the plan provides:
(a) Settlement Payments shall be paid until the death of the Employee for:
(1) total and permanent loss of sight in both eyes;
(2) loss of both feet at or above the ankle;
(3) loss of both hands at or above the wrist;
(4) loss of one foot at or above the ankle and the loss of one hand at or above the wrist;
(5) an injury to the spine that results in permanent and complete paralysis of both arms, both legs, or one arm and one leg; or
(6)an[] injury to the skull resulting in incurable insanity or imbecility.

. Glover succeeded in enforcing the arbitrator's decision in federal district court. IBP has taken an appeal from that court’s judgment, see Glover v. IBP, Inc., No. 02-10277 (5th Cir.), and continues to argue that the arbitrator exceeded his authority, see Appellant's Br., passim.

. The only evidence we found of an IBP employee having admitted to misrepresentations came from Klumpe’s own testimony. He testified that in his meeting with Suther following Escamilla's incident, James Crow, another IBP supervisor, told Klumpe that IBP would "f— him over just like we do everyone else.”

. IBP also argues that Klumpe's Sabine Pilot claim is preempted by the Employee Retirement Income Security Act, and that punitive damages are unavailable in this case or, alternatively, are subject to a statutory cap. Having determined that there was no evidence of deception, we need not reach these points. Nor need we take up the district court’s determination that the deception (if any) would not have caused Escamilla to execute the waiver.