**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**November 18, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 02-11124

CLEERE DRILLING COMPANY,

Plaintiff - Counter Defendant - Appellant,

versus

DOMINION EXPLORATION & PRODUCTION, INC.,

Defendant - Counter Claimant - Appellee.

--------------------
Appeal from the United States District Court
for the Northern District of Texas
--------------------

Before WIENER, CLEMENT, and PRADO, Circuit Judges.

WIENER, Circuit Judge:

Cleere Drilling Company ("Cleere") appeals the district court's bench trial judgment, which rejected Cleere's claims against Dominion Exploration & Production Inc. ("Dominion") and held Cleere liable to Dominion for almost $2 million in damages. These damages resulted from the blowout of Kenaf Industries Unit No. 1 Well (the "Well"), which Cleere had contracted to drill for Dominion. Cleere contends that the district court misconstrued various provisions of the standard form International Association of Drilling Contractors ("IADC") footage drilling contract, July 1998 revision, (the "Contract"), as revised by the parties and entered into by Cleere as contractor and Dominion as operator.

Cleere also contends that the district court erred in various findings of fact. We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

## I. Facts and Proceedings

This action arises from the blowout and resulting total loss of the Well. Central to the action are issues of responsibility for several categories of resulting losses and damages.

While drilling ahead at a depth of approximately 2500 feet en route to a "contract footage depth" of 3600 feet, the project got into trouble after Cleere's toolpusher ordered a "short trip," in which "stands" of drill pipe were pulled out of the hole and run back in to ensure the integrity of the pipe. In the course of this operation, Cleere's driller "swabbed" the Well at least twice.[1] He completed the removal of the pipe despite observing an increase in the flow of drilling mud from the hole. When the driller realized that a potential well-control situation was developing, he had Cleere's crew attempt to activate the blowout preventer. They failed to do so, however, because they did not first close a hydraulic bypass valve, a critical prerequisite to the preventer's effective operation.

---

[1] A hole is "swabbed" when, in pulling the pipe out of the well, a drop in pressure is created. "The imposed pressure drop can create a negative pressure differential between the formation and the well bore with the well at a lower pressure, and thereby allow fluid to enter the well." 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 1063 (2002).

Cleere's toolpusher, who had not been present, came to the drill site promptly after being called and was eventually able to activate the blowout preventer and shut down the Well. Cleere's efforts to maintain control were ultimately unsuccessful, however, and the well cratered around its casing seven days after the initial loss of control. The Well eventually blew out through several surface fissures approximately 600 to 900 linear feet from the hole, spewing salt water, gas, sand, and chemically treated drilling mud on and around the drill site. As Cleere had neither the equipment nor the experience and expertise to control and kill the Well, Dominion retained the well-control firm of Boots & Coots to do so, at substantial cost to Dominion.

Cleere sued Dominion in state court, and Dominion removed the case to the district court based on diversity of citizenship. Cleere sought to recover for its services under the Contract for work performed both before and after the blowout. Specifically, Cleere sought $192,463, which included (1) $50,180 ($20 x 2,509 ft.) for the "value" of the hole that Cleere had drilled before it lost control of the Well; (2) $77,650 for 10 days and 2 hours "daywork" after it lost control; and (3) approximately $6,500 for other items, including 38 joints of drill pipe and 15 drill collars lost in the hole.

Dominion counterclaimed to recover costs and expenses totaling $1,955,596 comprising (1) $788,332 for controlling the blowout; (2) $861,615 for cleanup of the surface location, (3) $188,417 for

3

restoration of the surface location; (4) $52,000 for settlement of damage claims with the landowner, Kenaf Industries of South Texas L.P. ("Kenaf"); and (5) $65,232 for the differential between Dominion's cost of drilling a replacement well and the Well price under the Contract.

The district court conducted a bench trial, after which it ruled in favor of Dominion, awarding the entire amount sought and rejecting all of Cleere's claims. Cleere timely filed a notice of appeal.

## II. Analysis

### A. Jurisdiction

The district court had jurisdiction by virtue of the diversity of citizenship provisions of 28 U.S.C. § 1332(a)(1) following Dominion's removal of the case from the state court in which Cleere had originally filed it. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

### B. Standard of Review

We review the district court's interpretation of the Contract de novo, as such an interpretation requires the determination of legal questions.[2] As the district court's award of compensatory damages presents an issue of fact (absent an error of law), our

---

[2] See Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc., 220 F.3d 679, 681 (5th Cir. 2000).

4

review of this aspect of the judgment, like all other factual findings of the district court, is for clear error.[3]

C.   Cleere's Claims

On appeal, Cleere does not contest the district court's finding that Cleere's negligence caused the blowout, so the particular facts surrounding the blowout itself are not at issue. Rather, Cleere views the case as one of contractual allocation of risk that turns primarily on the release and indemnity provisions of the Contract. Cleere maintains that the Contract allocates to Dominion responsibility for much of the damage, irrespective of whether Cleere was negligent or otherwise at fault. Cleere also insists that the district court misconstrued the Contract as a result of misapplying Texas law.

1.   Recovery Based on Conversion of the Contract to "Daywork" Status

One important aspect of Cleere's theory of recovery against Dominion is the contention that, by its own terms, the Contract automatically converted from a "footage" basis to a "daywork" basis. Conversion to daywork basis would mandate different contractual allocations of liability, possibly entitling Cleere to the damages it seeks related to the uncompensated-for work it performed both before and after the blowout occurred, as well as the value of its lost equipment and materials. Cleere argues that

---

[3] See Rhodes v. Guiberson Oil Tools, 82 F.3d 615, 620 (5th Cir. 1996).

the district court erred in holding that, as a matter of law, such a conversion never occurred.

Cleere's contention that the Contract converted to daywork status is premised on the factual assertion that Cleere encountered several problematic conditions while drilling the Well, including abnormal pressure, loss of circulation, and failure of operator-supplied equipment. The presence of any of these conditions would have converted the Contract to a daywork status and entitled Cleere to collect on its claims for breach of contract. The district court found that none of these conditions occurred, and Cleere's arguments that they did are not persuasive. Cleere's definition of "abnormal pressure" contradicts the express language of the Contract and depends entirely on testimony that is not related to the contractual provisions at issue, but to normal pressure in a strict engineering sense.[4] Similarly, Cleere's argument regarding loss of circulation — which is entirely different from increased flow of drilling fluids — relates to the condition of the well following Cleere's actions that resulted in the blowout. As the district court noted in its order of June 27th, 2002: "Even if [abnormal pressure or lost circulation] were encountered, they were

---

[4] The Contract's Exhibit A states: "It is understood that in the event it becomes necessary ... to raise the mud weight at any time to 10.0 lbs. per gallon, it will conclusively constitute 'Abnormal Pressure' as that term is employed in Subparagraph 12.2 of the Contract." Cleere argues that a lower mud weight established abnormal pressure in this case, based on the testimony of Calvin Barnhill, an expert witness called by Dominion.

only encountered after the driller swabbed the Well," which action caused the increased flow and left it uncontrolled, leading to the blowout. We cannot say that the district court clearly erred in this determination, and the Contract is unambiguous that Cleere is liable in such a situation.[5] Finally, Cleere's contention that the <u>formation</u> <u>surrounding</u> the surface casing shoe — which formation is part of the earth — is somehow "operator supplied equipment" is untenable. We agree with the district court that the Contract never converted to a daywork basis.

2. <u>Recovery Under Footage Contract Basis</u>

We also agree with the district court's conclusion that Cleere cannot recover the damages that it claims under the Contract's footage basis. First, Cleere is not entitled to be paid for its drilling services that preceded the blowout because "contract footage depth" was never reached, a condition precedent to payment under subparagraph 5.1 of the Contract. Second, Cleere cannot recover for its post-blowout services because this claim depends on conversion of the Contract to daywork status which, as noted, never happened. And, third, under subparagraph 18.2 of the Contract,

---

[5] Subparagraph 18.6 states that "should a...blowout occur...for any cause attributable to Contractor's operations... while Contractor is engaged in the performance of work hereunder on a footage basis, all such loss of or damage to the hole shall be borne by Contractor." If loss of circulation occurred, it did not occur until after Cleere's actions that caused the blowout. Because Cleere was still working on a footage basis at that time, Cleere remained responsible under subparagraph 18.6's allocation of risks.

Cleere alone is responsible for any loss of its own "in-hole" equipment while the Contract is in footage status. Therefore, Cleere cannot recover from Dominion for the loss of drill pipe, collars, and the like. We affirm the part of the district court's judgment that rejects each of Cleere's damage claims against Dominion.

D.   Dominion's Claims

   1.   Recovery Based on Cleere's Negligence (¶18.15)

The district court held Cleere liable to Dominion after finding that Cleere's negligence caused the Well to blowout. In its discussion of this point, the district court correctly stated that, because this is a diversity case, Texas law governs all substantive contractual questions.[6] In its application of Texas contract law, the district court gave two reasons why Dominion recovers under these circumstances. First, held the district court, the overarching indemnity and release provisions contained in subparagraph 18.15 ("18.15")[7] do not, as a matter of law, meet

---

[6] See Klumpe v. IBP, Inc., 309 F.3d 279, 281 (5th Cir. 2002).

[7] Subparagraph 18.15 addresses all indemnity and release provisions of the Contract and specifically notes that causation, including negligence, will not justify disregard of those provisions:

> Indemnity obligation: Except as otherwise expressly limited herein, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties...including without limitation Subparagraphs 18.1 through 18.14 hereof, be without limit and without regard to the cause or causes thereof (including preexisting conditions),...breach of contract

8

the Texas public policy requirement of "fair notice" for release and indemnity agreements to be binding. The fair notice doctrine requires contract language of "express negligence" that is "conspicuous." The district court held that the Contract failed both prongs of this test for fair notice of indemnity clauses of a contract, and was therefore inadequate to release Cleere from damages resulting from its own negligence. Second, held the district court, the materials deposited on the drill site by the blowout did not constitute pollution or contamination as those terms are used in the Contract, absent which subparagraph 18.12 ("18.12") is not available to shift responsibility for those items from Cleere to Dominion, whether or not the Contract's indemnity and release provisions are enforceable under Texas law. We disagree with both determinations and shall discuss them in turn.

a. Fair Notice:  Express Negligence; Conspicuousness

The district court based its holding that the release and indemnity provisions of 18.15 do not meet the "fair notice" requirement on the decision of the Supreme Court of Texas in Ethyl Corporation v. Daniel Construction Company.[8]  The test for "fair notice" established in that case has two conjunctive prongs: (1) "express negligence," which requires that "a party seeking

_____

or the negligence of any party or parties....

[8] 725 S.W.2d 705 (Tex. 1987).

9

indemnity from the consequences of its own negligence must express that intent in specific terms within the four corners of the contract"[9]; and (2) "conspicuousness," which requires that the release and indemnity provisions at issue be sufficiently conspicuous to ensure the parties' conscious awareness of such provisions.[10] On appeal, Dominion concedes that the contractual language at issue meets the "express negligence" prong. Dominion nevertheless continues to contend on appeal that the release and indemnity language of paragraph 18 fails the conspicuousness prong. As the fair notice doctrine can be trumped by the jurisprudentially recognized exception of "actual knowledge," we now address that exception to determine whether it is applicable in this case.

Even if we assume without conceding that the pertinent language of the Contract is not sufficiently conspicuous to meet the second prong of the subject test, we are convinced that the requirement of fair notice —— both elements, i.e., express negligence and conspicuousness —— is irrelevant in the face of Dominion's actual knowledge of the subject provisions of the Contract. The Supreme Court of Texas explained in Dresser Industries, Inc. v. Page Petroleum, Inc. that "[t]he fair notice requirements are not applicable when the indemnitee establishes

---

[9] Enserch Corp. v. Parker, 794 S.W.2d 2, 8 (Tex. 1990); see also Ethyl Corp., 725 S.W.2d at 708.

[10] See Enserch Corp., 794 S.W.2d at 8.

10

that the indemnitor possessed actual notice or knowledge of the indemnity agreement."[11]

The record contains a surfeit of evidence to support Cleere's contention that Dominion had actual knowledge of the release and indemnity provisions of the Contract. Testimony at trial revealed that contract negotiations between Cleere and Dominion included consideration of and changes to several provisions of the IADC printed form, including a number in paragraph 18. As noted, 18.15 contains the Contract's provision for release and indemnity and 18.12 covers responsibility for pollution and contamination, the latter of which we address below. Furthermore, the acts of agents of the parties in making and initialing numerous changes to the printed form is facially evident on several pages of the Contract. Among the many changes were additions to or deletions from subparagraphs 18.3, 18.12, and 18.15, each of which was initialed by Dominion's representatives, David Linger and Richard Miller, as

---

[11] 853 S.W.2d 505, 508 n.2 (Tex. 1993). Because we are convinced that, as a matter of law, Dominion had "actual... knowledge" of these provisions, we do not address whether the format of the July, 1998 version of the IADC standard form domestic footage drilling contract — replete with a boldface, all-capitals legend, **"THIS AGREEMENT CONTAINS PROVISIONS RELATING TO INDEMNITY, RELEASE OF LIABILITY, AND ALLOCATION OF RISK"** that appears prominently on page 1 of the Contract, and the smaller but likewise bold and capitalized title of paragraph 18, **"RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK."** — is sufficient to satisfy the "conspicuousness" prong of the test. Similarly, our finding of "actual...knowledge" obviates any need to consider whether the Contract's language meets the "express negligence" prong, apart from the fact that Dominion has conceded (as Cleere has contended) that it does.

well as by a representative of Cleere. In addition, the several changes made in paragraph 18 are bracketed by changes made in preceding paragraphs 4, 6, and 16, and in following paragraph 29.

Dominion nevertheless attempts to avoid a holding that it had actual knowledge by implying that its Mr. Linger, who was directly involved in the negotiation and confection of the Contract as well as the changes to it, was not a lawyer and thus had no ability or responsibility for "the legal aspects of the contract." This feeble effort to maintain that Mr. Linger was somehow disqualified from understanding and therefore from having actual knowledge of the import of the indemnity provisions and the changes that he negotiated and made to those provisions — that, because he is not a lawyer, he could not and need not realize what he was doing — is specious. As noted in footnote 11 above, paragraph 18 is labeled **"RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK."** Mr. Linger and Mr. Miller made changes for Dominion that directly addressed indemnity and release, including the revision of 18.15, to which the phrase "but excluding wilful [sic] misconduct" was inserted in the margin to preclude indemnity or release under such circumstances. And, these revisions were initialed not only by Mr. Linger but also by Mr. Miller, the representative who signed the Contract for Dominion.

We find inescapable the conclusion that Dominion had actual knowledge of the contents and purposes of the entirety of paragraph

12

18 (allocation of risk and responsibility), including specifically 18.12 and 18.15, through the acts of Mr. Linger and Mr. Miller in negotiating on behalf of Dominion and personally initialing changes that deal directly with the indemnity provisions contained therein. Except disingenuously, Dominion cannot argue that, through its designated agents, it did not acquire actual knowledge of those provisions. If Dominion was uncomfortable with the qualifications of the two individuals who negotiated and signed off on the changes to the indemnity provisions on its behalf, it never made such qualms known to Cleere and cannot now be heard to disavow the acts of its agents.

In sum, we cannot affirm the district court's ruling that the release and indemnity provisions of the relevant subparagraphs of paragraph 18 do not apply for failure of the Contract to meet the fair notice requirements of Texas law. Dominion had actual knowledge of each of paragraph 18's subparagraphs that are relevant to this case, including 18.15's provisions governing indemnity and release and overriding the fault of the indemnified and released party. Dominion's actual knowledge of all pertinent provisions of paragraph 18 satisfies that exception to the fair notice requirement and makes that doctrine inoperable here. We hold that 18.15 applies in this case; stated differently, that as to 18.15, requirement of "fair notice" is rendered inapposite by virtue of the actual knowledge exception to that doctrine, and the parties

13

are therefore bound by the provisions of paragraph 18 and each of its subparagraphs.

2. <u>Recovery Based on Absence of Pollution or Contamination (¶18.12)</u>

Dominion insists that it is entitled to recover its costs of cleanup and restoration of the drill site, including damages paid in settlement with the landowner, because —— as held by the district court —— the "mess" on the surface was neither pollution nor contamination. Noting that, under 18.12, responsibility for any damages arising from "pollution or contamination" that originated below the "surface of the land" is allocated to Dominion alone, Cleere counters that the costs of the extensive cleanup and restoration of the surface location are the direct result of pollution or contamination (or both) that originated below the surface of the earth. In addition to holding that, as a matter of law, the Contract's indemnity and release provisions on which Cleere relies are ineffectual under the Texas fair-notice doctrine (a holding we have reversed above),[12] the district court also held

_____

[12] Dominion also argues on appeal that, because no changes were made to 18.12's subsection (b), the subsection relied on by Cleere to absolve itself from cleanup and restoration liability, there is no proof of Dominion's actual knowledge of the contents of that particular subsection, making it inoperable because of the fair notice doctrine. As we discussed in section II(D)(1)(a) above, this argument is spurious as to 18.15, and it is even more so with regard to 18.12. The fact that Dominion's agents negotiated, made, and initialed changes to 18.12(a) (albeit not to subsection (b) thereof), as well as other subparagraphs of paragraph 18 that either precede or follow it, is more than probative of Dominion's direct advertence to (and therefore actual knowledge of) the entire text of paragraph 18, including subsection (b) of 18.12.

14

that the spoliation of the surface location constituted neither pollution nor contamination as those terms are used in the Contract. Cleere's responsibility for costs and expenses incurred by Dominion in cleaning up and restoring the surface of the land at and in the vicinity of the drill site thus turns on whether the salt water, sand, and drilling mud deposited on the surface of the land as a result of the blowout constitutes "pollution or contamination" for purposes of 18.12.[13]

The pertinent text of 18.12, **"Pollution and Contamination,"** specifies:

> Notwithstanding anything to the contrary contained herein,...it is understood and agreed by and between [Cleere] and [Dominion] that the responsibility for pollution and contamination shall be as follows: (a)...<u>[Cleere] shall assume all responsibility for</u>... causes of action of every kind...arising from pollution

---

Dominion's attempt to micro-parse the revisions to the printed form down to the subsection of the subparagraph at issue is specious at best, akin to arguing that Dominion had no knowledge of the first <u>clause</u> of subsection (a) of 18.12 because it made changes only to the second clause.

[13] As a preliminary matter, we note that our affirmance of the district court's holding that the Contract never converted to a daywork basis is not material to the question of responsibility for damages arising from pollution or contamination. The language of 18.12, titled "**Pollution and Contamination**," declares expressly that its provisions supersede all other contractual provisions, except for paragraph 15 and subparagraph 18.13, neither of which is relevant to this case. The introductory clause of 18.12 states that "[n]otwithstanding anything to the contrary contained herein...the responsibility for pollution and contamination shall be as follows." Thus, whether the Contract might have converted from footage to daywork does not affect the applicability of 18.12, which applies whenever damage arises from pollution or contamination, regardless of whether drilling operations are then being conducted on a footage or a daywork basis.

15

> or contamination, which <u>originates above the surface of the land</u> or water...
>
> (b) <u>[Dominion] shall assume all responsibility for</u>, including control and removal of, and shall protect, defend and indemnify [Cleere] from and against all claims, demands, and causes of action of every kind and character arising directly or indirectly from <u>all other pollution or contamination</u> which may occur during the conduct of operations hereunder, <u>including</u>, but not limited to, <u>that which may result from</u> fire, <u>blowout</u>, <u>cratering</u>, seepage <u>or any other uncontrolled flow</u> of oil, <u>gas, water or other substance, as well as</u> the use or disposition of <u>all drilling fluids, including</u>, but not limited to, oil emulsion, <u>oil base or chemically treated drilling fluids</u>,.... [Dominion] shall release [Cleere] of any liability for the foregoing (emphasis added).

There can be no dispute that (1) the putative contaminants in question (salt water, sand, gas, and mud, i.e., "chemically treated drilling fluids") originated hundreds of feet below the surface of the land, or (2) subsection (b) of 18.12 makes Dominion, as "Operator," responsible for <u>all</u> pollution and contamination that does not originate at or above the surface of the land. Dominion is therefore responsible for all damages resulting from the deposit of the subject sub-surface materials on the surface of the land <u>unless</u>, as held by the district court, the presence of those materials does not constitute pollution or contamination within the intendment of the Contract. Furthermore, by virtue of 18.15, Dominion's responsibility for such damage to the surface is not negated by Cleere's having caused the blowout that resulted in the deposit of such materials on the surface. Thus, the only way for Cleere to be held responsible under subsection (b) of 18.12 for damages resulting from the spread of salt water, sand, and

16

chemically treated drilling fluids on the land, would be for Dominion to prevail —— as it did in the district court —— on its contention that the presence of those materials did not amount to either pollution or contamination.

a. Pollution

The Contract does not define pollution or contamination. The district court acknowledged the presence of salt water, sand, and chemically treated drilling fluid on the land, but nevertheless held that, under the Contract, the presence of this foreign matter did not rise to the level of pollution or contamination of the surface of the land at or near the drill site, absent which Cleere could not rely on 18.12 for relief from liability. Cleere contests that holding, insisting that the blowout's deposit of those subsurface materials onto the surface of the land constituted "pollution" or "contamination," or both, within the meaning of 18.12. Consequently, insists Cleere, the costs that Dominion incurred in cleaning up and restoring the drill site and surrounding areas, and in settling with the landowner for its surface damages, must be borne by Dominion alone.

Not surprisingly, Dominion supports the district court's holding of no pollution or contamination as those terms are used in 18.12, asserting that the "mess" left by the blowout did not rise to the level of pollution or contamination. Dominion emphasizes that the substances in question are relatively benign and not environmental threats.

17

We have not previously considered the meaning of pollution or contamination in the context of oil and gas drilling contracts. In doing so today, we heed the canon of contractual interpretation that requires words and phrases in a contract to be given their plain meanings unless the document demonstrates that the parties intended for the terms to be employed in some special or technical sense,[14] which is not the case here. Black's Law Dictionary defines "pollution" as "[c]ontamination of the environment by a variety of sources including but not limited to hazardous substances, organic wastes and toxic chemicals. Pollution is legally controlled and enforced through various federal and state laws and agencies."[15] Noting that independent soil testing determined that there did not appear to be a "significant impact" to the surface area from the blowout, Dominion reasons that this fact and the absence of an environmental remediation order from the Texas Railroad Commission is further proof that there was no pollution or contamination at the site.

Any persuasiveness of Dominion's logic regarding pollution —— given the typical focus of that word on harm to the environment, and no such harm appearing to have occurred here —— is significantly less when applied to contamination. Subsection (b)

---

[14] See, e.g., Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); N. Natural Gas Co. v. Conoco, Inc., 986 S.W.2d 603, 606 (Tex. 1998).

[15] BLACK'S LAW DICTIONARY 1159 (6th ed. 1990)(emphasis added).

of 18.12 refers disjunctively to "pollution <u>or</u> contamination" as words of different meanings, not as synonyms. Cognizant of another canon of interpretation that requires courts to give effect to each contractual term so that none is rendered meaningless,[16] we must determine whether <u>either</u> pollution <u>or</u> contamination occurred here.

b.    <u>Contamination</u>

When we examine the Contract's use of the term "contamination," we are not convinced that any sort of environmental harm is required. In contrast to its definition of pollution, <u>Black's Law Dictionary</u> defines contamination as a "[c]ondition of impurity resulting from mixture or contact with foreign substance."[17] And, <u>Black's</u> definition of pollution as an enhanced subcategory of contamination supports Cleere's contention that environmental harm is not an essential element of all contamination; rather, it is an exacerbating element that makes pollution a more noxious subcategory of contamination. Similar to <u>Black's</u>, <u>Webster's Third New International Dictionary</u> defines the verb, "to contaminate" as "to soil, stain, corrupt, or infect by contact or association...to render unfit for use by the introduction of unwholesome or undesirable elements."[18] In sum, all pollution is contamination, but not all contamination is pollution.

---

[16] <u>See</u> <u>Heritage Res.</u>, 939 S.W.2d at 121; <u>N. Natural Gas Co.</u>, 986 S.W.2d at 606.

[17] BLACK'S LAW DICTIONARY 318 (6th ed. 1990).

[18] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 491 (1986).

19

Even if we assume arguendo that the materials disgorged onto the drill site and its surroundings are not so noxious as to be deemed pollutants because their presence either did not or could not cause environmental damage, their presence certainly meets the definition of "contamination." Relative to the surface of the drill site, the salt water, sand, and drilling mud (with its associated chemical additives) indisputably were "foreign substances." It is equally indisputable that these substances were "undesirable elements" that rendered the surface area soiled, stained, impure, and almost certainly unfit for its intended use. If this were not true, we ask rhetorically, why would Dominion have spent hundreds of thousands of dollars on the expedited removal of those substances, and, in addition, have paid the landowner a cash settlement for surface damages?[19]

Dominion argues that such a definition of contamination gives the term too wide a scope; that even though the blowout created a "substantial and obvious condition which had to be cleaned up," that "condition" was only a "mess" and did not amount to contamination. Scope is clearly critical to this issue. There could be many situations that come within the common definitions of "contamination" yet fall outside the range of circumstances intended by the parties to be covered by that term.

---

[19] Had Dominion performed the cleanup solely in anticipation of some regulatory compliance, any cognizant agency would have to have deemed such foreign substances to be contaminants, if not pollutants.

Although, as observed earlier, we have not addressed contamination in the context of drilling contracts, we and other courts have considered the scope of "contaminant" in the context of pollution exclusions in insurance contracts. In Pipefitters Welfare Education Fund v. Westchester Fire Insurance Company,[20] the Seventh Circuit addressed the issue in the following way:

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope ....[21]

In Certain Underwriters at Lloyd's London v. C.A. Turner Construction Company, we agreed with the Seventh Circuit's "common-sense approach" to this problem.[22]

The issue in Certain Underwriters was whether the temporary release of a gas — which quickly dissipated but not before causing injury — was pollution and therefore exempted from coverage by a policy exclusion.[23] We concluded that the release of gas was

---

[20] 976 F.2d 1037 (7th Cir. 1992).

[21] Id. at 1043 (quoting Westchester Fire Ins. Co. v. City of Pittsburg, 768 F. Supp. 1463, 1470 (D. Kan. 1991)).

[22] 112 F.3d 184, 188 (5th Cir. 1997).

[23] In that context, the need to limit the scope of "contamination" is even more pressing than in the instant case, because the insurance clause at issue barred recovery only for those claims resulting from pollution; contamination was discussed only insofar as it made up part of the overriding definition of the first term. Contamination in that context could not be viewed as something distinct from and lesser in degree than pollution, whereas here the two terms are used in the disjunctive, making

21

pollution and therefore excluded from the policy's coverage, explaining that such a conclusion did not conflict with the Seventh Circuit's approach "in view of the substantial nature of the discharge that occurred."[24]

We perceive the instant situation to be analogous. Obviously, neither pollution nor contamination is the cause of "bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, [or]...bodily injury caused by an allergic reaction to chlorine in a public pool," despite the fact that both Drano and chlorine could probably be classified as contaminants in those situations.[25] Similarly, fresh water that would evaporate in a matter of days, or a fine layer of sand that would cause no impairment to the use of the surface of rural land, should not be considered contamination. The instant situation is far different, however.

Testimony at trial revealed that temporary dams had to be constructed and that vacuum trucks removed fluid waste "24 hours a day" to "keep it from going all over the country." In all, Dominion hauled away and disposed of more than 3900 barrels of waste fluids resulting from the blowout. These actions obviously were taken to minimize both the surface damage from the blowout and

---

contamination properly viewable as a separate contractual item.

[24] Certain Underwriters, 112 F.3d at 188.

[25] Pipefitters Welfare Educ. Fund, 976 F.2d at 1043.

the need to eliminate foreign substances and undesirable elements that might render the surface of the land unfit or undesirable for use, indefinitely if not permanently.

Our legal conclusion that contamination occurred comports with the overall structure of the Contract. The only subparagraph that could be applicable to the surface restoration and cleanup costs at issue is 18.12. For example, subparagraphs 18.1 through 18.5 address surface and in-hole equipment, and subparagraphs 18.6 and 18.7 address damages to the hole itself.[26] Similarly, subparagraphs 18.8 and 18.9 address underground damage and inspection of damage, respectively. The remaining subparagraphs of paragraph 18 are likewise inapplicable. As the foreign matter at issue here can be

---

[26] Although Dominion argues that subparagraph 18.6 allocates the entire risk of loss to Cleere under the footage provisions of the Contract, subparagraph 18.6 actually discusses only damage to the hole itself, explaining how expenses related to any replacement well are allocated:

> 18.6 **The Hole-Footage Basis:**...[S]hould a fire or blowout occur or should the hole for any cause attributable to [Cleere's] operations be lost or damaged while [Cleere] is engaged in the performance of work hereunder on a footage basis, all such loss of or damage to the hole shall be borne by [Cleere]; and if the hole is not in condition to be carried to the contract depth...[Cleere] shall...commence a new hole without delay at [Cleere's] cost.... (emphasis added).

The presence of salt water, sand, gas, and drilling mud at the surface cannot be classified as "damage to the hole." This conclusion comports with the structure of the Contract: Responsibility for damage to the hole and the cost of any replacement well are allocated based on whether the Contract is proceeding on a footage or a daywork basis, but surface problems resulting from pollution or contamination constitute an altogether separate category of damages, not dependent on that conversion.

23

considered contaminants under these circumstances, the structure of the Contract further supports the conclusion that, for today's purposes, they are contaminants: Either (1) the Contract fails to account for this category of damage entirely, despite its otherwise comprehensive attention to contingencies and potential losses, or (2) this kind of damage is meant to come within the purview of 18.12. We conclude that this type of damage is covered by 18.12.

Finally, Dominion argues that because subsection (b) of 18.12 contains release provisions, and release is an affirmative defense, Cleere had to plead release expressly but failed to do so.[27] As Cleere correctly points out, however, three of the Pretrial Order's contested issues of law ineluctably implicate release when they address the allocation of risk and shifting of liability. More to the point, the record confirms that the issues of indemnity and release were tried in the district court by implicit consent of the parties. Dominion never objected to testimony concerning the negotiations surrounding, and the changes made to, the Contract's indemnity and release provisions; and the district court's opinion discusses those provisions extensively.[28] The validity of the

---

[27] For support of this position, Dominion cites an Eighth Circuit case, Day v. Toman, 266 F.3d 831, 836 (8th Cir. 2001). ("Release is an affirmative defense which will be considered by the court only if properly pleaded.")(quoting Watts v. Butte Sch. Dist. No. 5, 939 F. Supp. 1418, 1424 (D. Neb. 1996)).

[28] See United States v. Shanbaum, 10 F.3d 305, 312 (5th Cir. 1994) ("Whether an issue has been tried with the implied consent of the parties depends upon whether the parties recognized that the unpleaded issue entered the case at trial, [and] whether the

24

indemnity and release provisions is an issue that was tried without objection to the district court, and we must take the issues as they come to us: "We do not adjudicate by labels. We adjudicate cases on the facts and law as they fit and support each other <u>in the trial as the case progresses</u>."[29] In short, Dominion's argument on this hypertechnical point is wholly unpersuasive.

At oral argument, Dominion suggested in the alternative that, if we should conclude that the surface eruptions of salt water, sand, gas, and drilling mud constituted pollution or contamination, we should remand for a determination by the district court of exactly what damages were caused by those items and thus, under 18.12, are the responsibility of Dominion. We agree. It is counterintuitive that any substantial part of the cleanup and restoration costs did not "aris[e] directly or indirectly" from the surface presence of these subsurface contaminants. Still, Dominion should have the opportunity to demonstrate that at least some of its restoration and cleanup efforts —— as, for example, repairing and restoring the physical character of the land at the locations of the fissures where the Well blew out through the surface —— and thus the costs of such work, are more properly attributable to something other than contamination, and are therefore Cleere's responsibility.

_____

evidence that supports the unpleaded issue was introduced at trial without objection ....").

[29] <u>Id.</u> at 313 (emphasis added).

Whether based on the existing record or on the record as supplemented on remand, the district court should make these determinations in the first place. We therefore remand the case to the district court for it to conduct a closer examination and allocation of the nature and costs of cleanup and restoration of the surface, and their relationship (or lack thereof) to contamination. The district court shall do so, of course, in the context of our holding that the salt water, gas, sand, and drilling mud that erupted onto the drill site and vicinity are contaminants, as that term is used in 18.12, even if not pollutants as well. And we defer to the district court to decide, in its discretion, whether additional evidence is necessary or desirable. If the district court finds that any aspects of Dominion's cleanup or restoration involved damage that did <u>not</u> result from contamination, the court shall assign responsibility therefor to Cleere or Dominion, as the case may be, depending on which provisions of the Contract are applicable. In any case, however, the court shall assign to Dominion responsibility for all cleanup and restoration necessitated directly or indirectly by contamination.

c. <u>Settlement with the Landowner</u>

A few weeks after the blowout, Dominion entered into a settlement agreement with Kenaf, the owner of the surface and the mineral rights of the land on which the Well was drilled. This agreement reflects Dominion's payment of $52,000 to Kenaf in full settlement of all claims for damages to the land on which the Well

26

was drilled, resulting from "an incident" (obviously referring to the blowout).  Although there can be no question that the need to clean up and restore the surface was a direct consequence of the blowout, neither the surface damages settlement agreement between Dominion and Kenaf Industries nor other record evidence that we have located or has been referred to us identifies the specific nature of the particular damages sustained by Kenaf as landowner, over and above or in addition to the contamination and the physical damage to the surface, all of which Dominion cleaned up and restored in kind.  We harbor no doubt that any damages to Kenaf's ownership interests resulted from the blowout, either directly or indirectly.  Yet we cannot determine from the record — and refuse simply to assume — that the damage to Kenaf's property interests for which it was paid $52,000 was caused (1) entirely, or (2) partially, or (3) not at all, by contamination.

We do hold, however, as a matter of law based on our interpretation of the Contract, that Cleere is responsible to Dominion for necessary and reasonable costs incurred in settling with Kenaf for its surface damages to the extent, if any, that any of such blowout-related damage to the landowner's interest did not result from contamination.  Like contamination-caused cleanup and restoration costs, any contamination-caused landowner damages would remain the responsibility of Dominion under 18.12 and thus would not be recoverable by Dominion from Cleere.

27

We therefore remand the issue of landowner damages to the district court for it to determine whether all, some, or none of Kenaf's damages resulted from contamination. If the court should conclude that any portion of such damages did not result from contamination, it then must determine (1) how much of the $52,000 that Dominion paid to Kenaf was for any such non-contamination landowner damages and (2) how much of that was necessary and reasonable, and thus reimbursable to Dominion by Cleere.

d. <u>Killing the Well</u>

Our plenary review satisfies us that the district court correctly held that Cleere's loss of the Well prior to reaching contract footage depth makes Cleere responsible for the necessary and reasonable costs and expenses occasioned by that lost control. This responsibility is not otherwise allocated by the Contract. Cleere's loss of control of the Well, coupled with Cleere's inability to bring the Well under control, left Dominion no choice but to hire a contractor capable of controlling and killing the Well. The district court correctly held Cleere responsible for the reasonable costs of this necessary operation.

e. <u>Drilling the Replacement Well</u>

In the same vein, even though the Well was eventually brought under control and killed, it was nevertheless unusable for purposes of drilling the Kenaf Industries No. 1 to contract footage depth. Dominion had no choice (other than abandoning the prospect

altogether) but to move over and drill a replacement well.[30]  Thus, as yet another natural consequence of Cleere's loss of the Well, Dominion experienced an additional necessary cost equal to the differential between the contract price for Cleere to drill the Well and the reasonable cost of retaining another contractor to drill the replacement well.  We agree with the district court's determination that Cleere is responsible to Dominion for the reasonable cost of this differential.  We thus affirm the district court's holding that Cleere is liable to Dominion for the differential in the costs between the contract price with Cleere and the reasonable cost of drilling the replacement well.

3. Necessity and Reasonableness of Dominion's Expenditures

Cleere's final contention is that the quantum of the district court's awards to Dominion for the costs and expenses it incurred following the blowout are not supported by record evidence.  Cleere does not question that Dominion actually paid the dollar amounts reflected on the invoices submitted by Dominion.  Rather, Cleere insists that the record is devoid of evidence showing that those expenditures were necessary and reasonable.  In response, Dominion

_____

[30] Subparagraph 18.6 of the Contract specifies that if a blowout occurs while Cleere is operating under a footage basis "[Cleere] shall...commence a new hole without delay at [Cleere's] cost...."  Cleere does not complain, however, that another contractor was selected to drill the replacement well, focusing instead on the reasonableness and necessity of that contractor's charges.

29

contests each of the foregoing assertions by Cleere and urges that we affirm the judgment of the district court in all respects.

The record confirms that Dominion presented essentially no evidence to prove that the amounts it admittedly expended following the blowout were necessary and reasonable. Thus, on remand, the district court must determine — in addition to (1) which, if any, of the cleanup or restoration items that Dominion paid for were <u>not</u> the result of contamination from the blowout; (2) which, if any, of the items of landowner damages for which Dominion paid Kenaf a total of $52,000 were <u>not</u> the result of contamination from the blowout; and (3) whether the dollar amounts spent by Dominion on any non-contamination items of (a) cleanup and restoration or (b) landowner damages were necessary and reasonable — whether and to what extent the concededly necessary costs of controlling and killing the Well and having the replacement well drilled were reasonable.

The required inquiry into the necessity and reasonableness of expenditures is a very fact-intensive process, making it prudent for us to allow the district court, in its role as factfinder, to have the first opportunity to consider that aspect of any damage awards. We therefore leave these determinations to the district court. In regard to categorizing the various aspects of cleanup, restoration, and landowner damage as either contamination or non-contamination, and to determining which of Dominion's expenditures on these items were necessary and reasonable, we leave to the

30

discretion of the district court whether the record is adequate or in need of supplementation. The same applies to the court's determination of the reasonableness of the concededly necessary costs of controlling and killing the Well and drilling a replacement.

## III. Conclusion

For the foregoing reasons, we affirm that part of the district court's judgment that holds that the Contract never converted from a footage to a daywork basis. We also affirm the part that rejects Cleere's claims for (1) pre-blowout drilling services (because Cleere never reached "contract footage depth"), (2) daywork services (because the Contract never converted to a daywork basis), and (3) the loss of its own property in the hole (because, under subparagraph 18.2, Cleere remains responsible for any loss of its in-hole equipment while performing on a footage basis). And we affirm the part of the court's judgment that holds Cleere responsible for all necessary and reasonable costs incurred by Dominion in controlling and killing the Well and for the differential between the contract cost of drilling the Well and the reasonable cost of drilling the replacement well; but we vacate the quantum of the court's awards to Dominion for these items and remand for the district court to determine how much of Dominion's expenditures on these necessary items was reasonable, and thus reimbursable by Cleere.

31

Furthermore, we reverse the part of the district court's judgment that holds the Contract's indemnity and release provisions inapplicable for lack of "fair notice"; and we hold that doctrine irrelevant because Dominion had actual knowledge of the indemnity and release provisions of the Contract. We also reverse that part of the judgment that holds the salt water, sand, and drilling mud that the blowout spread on the surface of the land did not constitute contamination of the drill site and the surrounding area within the meaning of the Contract; we hold that the presence of the materials in question did constitute contamination within the meaning of the Contract.

Next, we vacate the quantum of the district court's awards to Dominion for costs incurred in the cleanup and restoration of the surface, and remand for the court to determine (1) whether, consistent with this opinion, any portion of Dominion's expenditures for cleanup or restoration of the drill site and surrounding areas is not attributable to contamination and is therefore Cleere's responsibility under the Contract; and, (2) if so, how much of each such non-contamination expenditure is necessary and reasonable, and therefore reimbursable by Cleere. We likewise vacate the quantum of the district court's award to Dominion in reimbursement of payments to Kenaf for landowner damages, and remand for the court to determine (1) whether, consistent with this opinion, any portion of such landowner damages to Kenaf is not attributable to contamination and is therefore

32

Cleere's responsibility under the Contract; and (2) if so, how much of such non-contamination landowner damages is necessary and reasonable, and therefore reimbursable by Cleere.

AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED with instructions.