## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-11043

United States Court of Appeals
Fifth Circuit

**FILED**
January 17, 2020

Lyle W. Cayce
Clerk

EASTERN CONCRETE MATERIALS, INC.,

    Plaintiff-Counter Claimant – Appellant

v.

ACE AMERICAN INSURANCE COMPANY,

    Defendant

v.

GREAT AMERICAN INSURANCE COMPANY,

    Counter Defendant – Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before OWEN, Chief Judge, and JONES and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The issue raised here is whether an unplanned discharge of "rock fines," pellets produced during the course of quarry operations, is covered by a company's umbrella insurance policy or excluded by a pollution exclusion. Great American Insurance Company ("GAIC") sought a declaratory judgment that it is not required to defend or indemnify Eastern Concrete Materials, Inc. ("Eastern Concrete") because of a pollution exclusion in its insurance policy. The federal district court denied Eastern Concrete's motion to dismiss for lack

No. 18-11043

of personal jurisdiction and granted GAIC's motion for summary judgment. Eastern Concrete timely appealed. After careful review, we AFFIRM that federal jurisdiction exists and AFFIRM the district court's grant of summary judgment.

## BACKGROUND

Eastern Concrete is a New Jersey corporation that operates rock quarries in New Jersey. It is a wholly-owned subsidiary of U.S. Concrete, a Delaware corporation with its principal place of business in Euless, Texas. Given the overlapping leadership between Eastern Concrete and U.S. Concrete, at least two of Eastern Concrete's officers—its president and secretary—live in Texas, where they also serve as officers for U.S. Concrete.

U.S. Concrete purchased a commercial umbrella insurance policy ("GAIC Policy") for itself and more than sixty subsidiaries, including Eastern Concrete, from GAIC, an Ohio Corporation. The GAIC Policy, which provides nationwide coverage to the named insureds, was negotiated, brokered, and issued in Texas. U.S. Concrete does not typically maintain insurance to cover environmental liabilities. True to form, the GAIC Policy includes an "absolute pollution exclusion:"

> This insurance does not apply to:
> . . .
>
> Any liability, including, but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or in any way related to:
>
> > 1. The actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of "pollutants," however caused.
> >
> > 2. Any request, demand, or order that any "Insured" or others test for, monitor, clean up, remove, contain, treat,

2

> detoxify, neutralize or in any way respond to or assess the effects of "pollutants." . . .
>
> . . .
>
> This exclusion will apply to any liability, costs, charges or expenses, or any judgments or settlements, arising directly or indirectly out of pollution . . . .
>
> As used in this exclusion "pollutants" means any *solid*, liquid, gaseous or thermal *irritant or contaminant, including*, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and *waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.* (Emphasis added).

The parties dispute whether this pollution exclusion applies to the following facts.

At its rock quarry in Glen Gardner, New Jersey, Eastern Concrete "drills and blasts large pieces of stone off of the face of [a] rock formation." The stones are crushed and screened "to produce different sizes or gradations of stone." The smallest particles are called "rock fines." Rock fines are often collected by being washed off larger stones and gathered into settling ponds, after which they are removed, dried, and stockpiled on site to be used at the quarry or sold.

In July 2017, Eastern Concrete, anticipating substantial rain, began to lower the water levels in its settling ponds by pumping water, pursuant to a valid permit, into the nearby Spruce Run Creek. Unfortunately, the quarry manager "accidentally failed to shut off the pumping before the stone fines from the bottom of the settlement ponds began to be pumped into Spruce Run." As a result, "substantial amounts of rock fines" (up to two feet in some places) were released into Spruce Run Creek, causing "physical damage to the stream and stream bed by changing the flow and contours of the stream." Upon discovering the damage, the New Jersey Department of Environmental Protection ("Department") issued "Notices of Violation" to Eastern Concrete,

No. 18-11043

requiring it to remove the rock fines and take preventive measures to stem their migration downstream. The Department also found Eastern Concrete liable for violating various state statutes, including the New Jersey Water Pollution Control Act.

Eastern Concrete undertook the prescribed remediation. It then notified GAIC of the incident through its Texas insurance broker and demanded reimbursement for the costs of removing the rock fines and of defending the claim.[1] In response, GAIC filed a declaratory judgment action in the Northern District of Texas seeking a declaration that the incident fell within the GAIC Policy's pollution exclusion, and thus it had no duty to defend or indemnify Eastern Concrete. One month later, Eastern Concrete filed a competing lawsuit in New Jersey Superior Court. The New Jersey court stayed its case pending resolution of the federal suit. The federal district court rejected Eastern Concrete's subsequent motion to dismiss for lack of personal jurisdiction and, after GAIC moved for summary judgment, confirmed that the absolute pollution exclusion applied. Eastern Concrete timely appealed these adverse judgments.

**STANDARDS OF REVIEW**

"[W]hether personal jurisdiction can be exercised over a defendant is a question of law and subject to *de novo* review." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 584 (5th Cir. 2014). "The plaintiff has the burden to make a *prima facie* showing that personal jurisdiction is proper." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014)

---

[1] Eastern Concrete also notified its primary insurer, ACE American Insurance Company ("ACE"), of the same claims. ACE concluded there was coverage under its policy. However, the Glen Gardner incident cost Eastern Concrete over $2 million, exhausting its $1 million policy with ACE.

No. 18-11043

(emphasis added). "We must accept the plaintiff's uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Id.* (quoting *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002)).

This court "review[s] a district court's grant of summary judgment *de novo*, . . . view[ing] all facts in the light most favorable to the nonmoving party, and affirm[ing] only if the evidence shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 528 (5th Cir. 2011) (quoting FED. R. CIV. P. 56(a)). Where relevant, this court reviews a district court's choice-of-law determinations *de novo*, applying "the choice of law rules of the forum state, in this case Texas." *R.R. Mgmt. Co. v. CFS La. Midstream Co.*, 428 F.3d 214, 221–22 (5th Cir. 2005).

## DISCUSSION

### I. Personal Jurisdiction.

A federal court "may exercise personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004). "In this case, these two inquiries merge into one because the Texas long-arm statute permits the exercise of jurisdiction over a nonresident defendant to the fullest extent allowed by the United States Constitution." *Id.* Federal court jurisdiction satisfies Due Process if two conditions are met: "(1) the nonresident must have minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction must be consistent with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784,

786 (5th Cir. 1990)).  A defendant's "minimum contacts" may give rise to general or specific jurisdiction.  *See Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006).  Because we agree with the district court that specific jurisdiction exists, we need not address the parties' arguments about general jurisdiction.

Specific jurisdiction arises when a defendant's minimum contacts with a forum state are related to the pending lawsuit.  *Id.* at 469.

> This circuit applies a three-step analysis for the specific jurisdiction inquiry: (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Monkton Ins. Servs.*, 768 F.3d at 433 (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).  If a plaintiff establishes the first two prongs, the burden shifts to the defendant to show that the exercise of personal jurisdiction would be unfair or unreasonable.  *Id.*

Applying these principles, the district court concluded that it had specific jurisdiction over Eastern Concrete.  It began by noting Eastern Concrete's contacts with Texas.  First, GAIC "plausibly posit[ed] that the [GAIC Policy] was procured on behalf of Eastern Concrete by or through its president or secretary or both, acting in Texas."  Next, the GAIC Policy contained many Texas-specific features:  for instance, its "Forms and Endorsement Schedule" includes 46 endorsements, "every one of which lists Texas as the relevant state" and at least three of which are tailored to Texas; "no endorsement refers to any other state"; and the GAIC Policy directs insureds to contact the Texas Department of Insurance if they have complaints or need further information.  Finally, Eastern Concrete contacted a Texas insurance broker for assistance in

seeking coverage under the GAIC Policy for the Glen Gardner incident. Based on these contacts, the district court concluded that Texas was an appropriate forum for adjudicating GAIC's declaratory judgment action.

Pivotal to this jurisdictional holding was the district court's observation that "a corporation can purposely avail itself of the benefits of a forum through its agents" and its determination that GAIC "plausibly posit[ed] that the insurance was procured on behalf of Eastern Concrete by or through its president or secretary or both." Eastern Concrete takes issue with this conclusion. It contends that it never authorized U.S. Concrete to act as its agent to procure the GAIC Policy. And to the extent its officers living in Texas were involved, Eastern Concrete insists that when in Texas, they were acting solely in their capacity as officers of U.S. Concrete. By this logic, only one of the contacts discussed by the district court should have been attributed to Eastern Concrete. *See Walden v. Fiore*, 571 U.S. 277, 284, 134 S. Ct. 1115, 1122 (2014) (stating that specific jurisdiction "must arise out of contacts that the 'defendant [itself]' creates with the forum State"). And this single contact— "communicat[ing] with a Texas insurance broker 'for assistance in seeking coverage'"—is insufficiently purposeful action within the jurisdiction, according to Eastern Concrete.

Eastern Concrete's arguments fail to account for the procedural posture in which we review jurisdiction here. It is established that a plaintiff need only make a *prima facie* showing of personal jurisdiction if the district court rules on the issue without an evidentiary hearing. *Mullins v. Testamerica, Inc.*, 564 F.3d 386, 399 (5th Cir. 2009). Further, at that stage, courts are required to credit the plaintiff's uncontroverted allegations. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). The district court accordingly credited GAIC's allegations that "[i]n or before 2016, Eastern Concrete

engaged, or authorized its Texas-based parent company to engage on its behalf, . . . an insurance agency licensed by and operating within the State of Texas, to advise on and/or procure insurance coverage for Eastern Concrete's business operations." According to GAIC, the insurance agency then "negotiated and procured the [GAIC] Policy on behalf of U.S. Concrete and Eastern Concrete within the State of Texas."

For two reasons, Eastern Concrete's objection to the court's order resting on these allegations is ill-founded. First, although Eastern Concrete maintains that neither it nor its officers played a role in procuring the GAIC Policy, the company's affidavits proffered in support of this assertion fail to controvert GAIC's allegations. Affidavits from Eastern Concrete's officers stated that they do most of their work for Eastern Concrete from New Jersey. But the affidavits do not foreclose the possibility that Eastern Concrete's officers played a role in the procurement of the GAIC Policy in Texas. Nor do they state that U.S. Concrete acted alone in requesting a Texas-based insurance broker to obtain the GAIC Policy, much less that Eastern Concrete failed to authorize or approve its parent's obtaining that policy. The affidavits do not controvert the *prima facie* case.

Second, because Eastern Concrete did not continue to contest the facts underlying specific jurisdiction by renewing the issue at summary judgment or otherwise before judgment was entered, such inaction either "foreclose[d] the defendant's right to invoke the higher burden or proof otherwise applicable to jurisdictional facts . . ., or waive[d] the objection entirely." *Mullins,* 564 F.3d at 399. This court's appellate review is therefore confined to the existence of the *prima facie* case. *Id.*

Because GAIC sufficiently alleged, without contradiction, that Eastern Concrete procured, or authorized U.S. Concrete to procure, the GAIC Policy,

we move on to consider the elements of specific jurisdiction. Initially, as to whether Eastern Concrete "purposely directed its activities toward [Texas] or purposefully availed itself of the privileges of conducting activities there," *Monkton Ins. Servs.*, 768 F.3d at 433 (quoting *Seiferth*, 472 F.3d at 271), Eastern Concrete contends that the sole act of procuring the GAIC policy, if properly attributed to it, would be insufficient to show purposeful availment. Under the specific facts of this case, however, we agree with the district court: Eastern Concrete could have "reasonably anticipate[d] being haled into court" in Texas to litigate coverage under the GAIC policy. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).[2] As the district court observed, GAIC plausibly posited that Eastern Concrete engaged, or authorized U.S. Concrete to engage, a Texas insurance broker to procure the GAIC Policy.[3] The policy was purchased in Texas to benefit Eastern Concrete, and Eastern Concrete's coverage claim was later pursued by the same Texas broker that secured the GAIC Policy. Moreover, the GAIC Policy was distinctively Texan. Since any dispute between U.S. Concrete and GAIC over the policy would have compelling ties to Texas, it stands to reason

[2] *But cf.*, *Am. Eagle Ins. Co. v. Teague-Strebeck Motors, Inc.*, No. CIV. A. 3:96CV-2902P, 1997 WL 452948, at *5 (N.D. Tex. Aug. 5, 1997) ("One who merely purchases insurance from an insurer residing in the forum state does not, by the purchase through an intermediary, subject himself to the jurisdiction of the courts of the insurer's state.").

[3] The parties dispute the significance of U.S. Concrete's contacts with Texas. Eastern Concrete argues, *inter alia,* that even assuming U.S. Concrete was acting as Eastern Concrete's agent, U.S. Concrete's conduct is of no jurisdictional significance because jurisdiction-by-agency theories are dubious in the wake of *Daimler AG v. Bauman*, 571 U.S. 117, 134 S. Ct. 746 (2014). Not so. *Bauman* only analyzed general jurisdiction—and *Bauman* itself acknowledged that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction" and that "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." 571 U.S. at 135 n.13, 134 S. Ct. at 759 n.13 (emphasis in original); *cf. Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 n.4 (Tex. App. 2003) ("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal.").

that the subsidiary's ties mirror those of the parent.  It cannot be said that Eastern Concrete's contacts with Texas were "random, fortuitous, or attenuated."  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d at 588 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985)).

For similar reasons, this lawsuit "arises out of or results from" Eastern Concrete's "forum-related contacts."  *See Monkton Ins. Servs.*, 768 F.3d at 433 (quoting *Seiferth*, 472 F.3d at 271).  Eastern Concrete argues that its contacts with Texas are not related to the core issue in this case, the discharge of rock fines in New Jersey.  That is incorrect.  This is an insurance coverage dispute.  To the extent that Eastern Concrete's contacts with Texas are linked to the procurement and enforcement of the GAIC Policy, this lawsuit concerning the GAIC Policy "arises out of or results from" those contacts.

At the final step, Eastern Concrete must show that the exercise of personal jurisdiction is unfair or unreasonable.  *Monkton Ins. Servs.*, 768 F.3d at 433.  The court's assessment balances: "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies."  *Luv N' care*, 438 F.3d at 473.

Eastern Concrete presents several arguments why the exercise of personal jurisdiction in Texas was unfair and unreasonable.[4]    These

---

[4] According to Eastern Concrete, "Texas has virtually no interest in resolving an insurance dispute between two out-of-state parties based on conduct and damage occurring in New Jersey; GAIC's interest in the application of Texas law is minimal, as evidenced by its failure to include a choice-of-law clause in its insurance policy; the interstate judicial system is best served by the resolution of this dispute in New Jersey, where a state court proceeding…is currently stayed pending this appeal; and the two states share an interest…in furthering the reasonable expectations of policyholders who file claims based on injuries sustained in their home states."

arguments are unpersuasive.  As GAIC points out, the most important factor is the burden on the defendant, *see Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (noting that the "primary concern" is "the burden on the defendant").  The burden here is minimal because Eastern Concrete's "two most senior officers live and work a short drive from the courthouse, and one of them, Mr. Jolas, is by Eastern Concrete's own designation a person with 'unlimited' authority over the insurance issues in dispute."  In addition, because the damage from the rock fines has already been remedied, New Jersey's interest in the dispute is relatively small, as indicated by the New Jersey court's willingness to stay its action pending resolution of this case.  Thus, it is both fair and reasonable for Texas, the state where the GAIC Policy was "negotiated, brokered, and issued," to be the forum for a lawsuit that "concerns interpretation of that policy."  The district court properly exercised personal jurisdiction.

## II.  Summary Judgment.

Applying Texas law, the district court held that the GAIC Policy's pollution exclusion barred coverage in this case.  On appeal, Eastern Concrete challenges both the choice of law and the court's interpretation of the pollution exclusion.  Each contention will be addressed in turn.

### 1.  Texas Law Governs this Dispute.

When a contract contains no choice-of-law provision and no statute indicates which law to apply, Texas courts apply the "law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties."  *Maxus Expl. Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1) (AM. LAW INST. 1971)).  To decide which state has "the most significant relationship," Texas courts consider the following factors:

- The needs of the interstate and international systems;
- The relevant policies of the forum;
- The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
- The protection of justified expectations;
- The basic policies underlying the particular field of law;
- Certainty, predictability, and uniformity of result; and
- Ease in the determination and application of the law to be applied.

*Id.* at 54 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6).  Courts will also consider the place of contracting; place of contract-negotiation; place of performance; the location and subject matter of the contract; and the parties' domicile, residence, nationality, place of incorporation, and place of business. *Id.* at 53 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2)).

Citing these principles, the district court held that "Texas has the most significant relationship to the substantive issue to be resolved, that is, whether the absolute pollution exclusion precludes insurance coverage."  In support, the court observed that: the GAIC Policy "was negotiated, brokered, and issued in Texas"; "Texas courts would not give weight to the location of the insured risk" because the policy is national in scope; U.S. Concrete's "justified expectations," as purchaser, "would be met by application of Texas law"; and New Jersey's interest is small because "the cleanup has already taken place."  We agree with the district court.

In support of its argument that New Jersey law should apply, Eastern Concrete highlights only two of the relevant factors.  According to Eastern Concrete, "New Jersey . . . has an interest in assuring a New Jersey policyholder is not wrongly denied funds to repair the State's property." Moreover, because it is not a Texas corporation, Eastern Concrete asserts that "Texas's interest in protecting Eastern Concrete, if any, is slight."  Eastern Concrete also insists that it expected to litigate any insurance-related disputes

in New Jersey, and that application of Texas law thwarts its justified expectation.

Contrary to Eastern Concrete's assertions, the place of contracting, not the place of the underlying incident, is the dominant consideration for choice of law in an insurance-coverage dispute. *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996) ("[W]hen the issues of a case require the construction and application of insurance policies . . . the relevant inquiry is what contacts the state has with the insurance dispute, and not with an underlying lawsuit."); *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 344–46 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (similar). As GAIC points out, "giving [controlling] weight to the location of the insured risk would potentially subject an insurer, through one contract, to the laws of numerous states on issues that are more appropriately determined by the state's law that promulgated the policy form at issue." *Reddy Ice Corp.*, 145 S.W.3d at 345. In addition, especially where the harms have been remedied, a state "has little interest in whether any settlements or judgments are paid by [the insured], or instead, by its insurers, or in regulating the scope of a pollution exclusion clause contained in an insurance policy issued in [a different state]." *Id.* at 346. In sum, the district court correctly applied Texas law.

### 2. The Pollution Exclusion

Under Texas law, insurance policies are governed "by [the] rules of interpretation and construction which are applicable to contracts generally." *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Id.* "The terms used in the policy are given their plain, ordinary meaning

unless the policy itself shows that the parties intended the terms to have a different, technical meaning." *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). "When terms are defined in an insurance policy, those definitions control the interpretation of the policy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003). Neither party contends that the relevant policy terms are ambiguous.

Applying these principles, the district court concluded that rock fines are pollutants under the GAIC Policy and, thus, that GAIC had no duty to defend or indemnify Eastern Concrete. By way of reminder, the GAIC Policy's pollution exclusion bars coverage for liability "arising out of or in any way related to . . . discharge, dispersal, seepage, migration, release or escape of 'pollutants.'" "Pollutants," in turn, is defined as "any solid, liquid . . . irritant or contaminant, including, but not limited to . . . waste material," which "includes materials which are intended to be or have been recycled, reconditioned or reclaimed." After explaining how rock fines are generated, the district court determined that rock fines are "waste material generated in the rock crushing process" because they are "materials intended to be reclaimed." Moreover, the rock fines "became irritants or contaminants when they were discharged and dispersed where they did not belong." If this were not so, the district court reasoned, "New Jersey would not have required remediation," and Eastern Concrete would not have been sanctioned for violating New Jersey's Water Pollution Control Act. (citing N.J. STAT. ANN. § 58:10A-3(n), which lists "rock, sand, [and] cellar dirt" as "pollutants").

Eastern Concrete challenges this result on appeal, contending that "[t]o fall within the definition of 'pollutants' under the exclusion, the rock fines must be *either* (1) a 'waste material' and an 'irritant or contaminant' *or* (2) otherwise qualify as an 'irritant or contaminant.' Rock fines are neither." (Emphasis in

original).  We take on the question of whether rock fines are "contaminants" because, as Eastern Concrete concedes, concluding that they are ends our analysis.[5]

Eastern Concrete contends that "[r]ock fines are simply 'small particles of rock,'" and thus "are not dangerous" and "do not . . . contaminate."  To hold otherwise, Eastern Concrete cautions, would be to adopt the district court's reasoning that rock fines became "contaminants when they were discharged and dispersed where they did not belong," a theory Eastern Concrete casts as dangerously overbroad because it allows anything (even water or bricks) to become contaminants if left in an inappropriate place.  GAIC responds by accusing Eastern Concrete of inventing a "hazardousness" requirement: "[N]othing in the ordinary sense of the word 'contaminant' or in the caselaw imposes such a restriction," GAIC insists, and "[n]umerous cases hold that rock and similar materials are contaminants for purposes of the absolute pollution exclusion."  In support, GAIC cites *Cleere Drilling Co.*, where this court determined that "salt water, sand, and drilling mud" were contaminants under a contractual pollution exclusion even assuming they "did not or could not cause environmental damage."  *Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 651 (5th Cir. 2003).

We agree that *Cleere Drilling Co.* is instructive.  The definitions of "contaminant" this court adopted in that case are particularly helpful.  The court noted that "*Black's Law Dictionary* defines contamination as a '[c]ondition of impurity resulting from mixture or contact with foreign substance.'"  *Id.* (alteration in original) (quoting BLACK'S LAW DICTIONARY 318

---

[5] GAIC does not argue that the rock fines are "irritants."  Consequently, we do not consider that term of the policy.  *See United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("Inadequately briefed issues are deemed abandoned.").

(6th ed. 1990)).    The court also cited *Webster's Third New International Dictionary*, which "defines the verb, 'to contaminate' as 'to soil, stain, corrupt, or infect by contact or association . . . to render unfit for use by the introduction of unwholesome or undesirable elements.'"    *Id.* (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 491 (1986)).

Rock fines do not fit either definition when we ask whether they affected the quality of the water in Spruce Run Creek.    Perhaps rock fines were "undesirable elements" when discharged into the creek.    But they did not "mix" with the creek in a way that made it "impure."    Nor did they "soil, stain, corrupt, or infect" the creek or "render [it] unfit for use."    To the contrary, according to a notice issued by the Department shortly after the incident, the rock fines posed "no threat to drinking water, nor to anyone who would use the area for fishing nor to the fish that they might catch."

But when we look at the effects on the overall ecosystem, rock fines are contaminants.    Eastern Concrete's own counsel described the incident as pumping "a deleterious substance resulting in a negative impact to a trout producing stream and a documented habitat for threatened or endangered species." And Eastern Concrete's expert explained that the incident "chang[e]d the flow and contours of the stream, including areas used for trout spawning" and "physically cover[e]d the micro and macro invertebrates that serve as a food source for fish and other species."    The rock fines, in short, "render[e]d [the creek] unfit for use" as a habitat for trout and other species.    This explains why Eastern Concrete was required to remove the rock fines from Spruce Run Creek.[6]

---

[6] *Cf. Cleere Drilling Co.*, 351 F.3d at 651–52 ("It is equally indisputable that these substances were 'undesirable elements' that rendered the surface area soiled, stained, impure, and almost certainly unfit for its intended use.    If this were not true, we ask rhetorically, why would Dominion have spent hundreds of thousands of dollars on the

No. 18-11043

We thus conclude that rock fines qualify as "contaminants" under the GAIC Policy.  Summary judgment was therefore appropriate.

## CONCLUSION

The district court correctly exercised jurisdiction over Eastern Concrete and properly granted summary judgment.  We accordingly **AFFIRM**.

---

expedited removal of those substances, and in addition, have paid the landowner a cash settlement for surface damages?").